# Richmond

EMMANOUIL NEAPOLIDIS AND OTHERS V. THE THEOFANA MARITIME· COMPANY, LIMITED, AND OTHERS.

March 12, 1951.

Record No. 3755.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan and Miller, JJ.

The opinion states the case.

*Morewitz & Morewitz,* for the plaintiffs in error.

*Hughes, Little & Seawell* and *Harry E. McCoy, Jr.,* for the defendants in error.

EGGLESTON, J., delivered the opinion of the court.

Emmanouil Neapolidis, Alexandros Alexandris, Ioannis Liadis and Ioannis Vartholomeos, citizens of Greece, and serving as seamen on board the Greek Steamship MEANDROS, hereinafter referred to as the petitioners, filed their joint petition for attachment in the court below against The Theofana Maritime Company, Limited, and others, as owners and operators of the vessel, and against M. Houmis, its master, sometimes hereinafter referred to as the respondents, asserting a number of separate causes of action. Those with which we are concerned on this writ of error may be grouped thus:

Each of the petitioners claimed a balance due for earned wages, with liquidated damages for failure to pay promptly. Each sought damages for his alleged wrongful discharge.

Three of the petitioners, Alexandris, Liadis and Vartholomeos, sought damages for the alleged delay of the master in returning their seamen's books to them, respectively, and for failing to note therein their discharge.

Two of the petitioners, Liadis and Neapolidis, sought damages because of the alleged failure and refusal of the master to furnish each prompt and adequate medical care for illness incurred while in the service of the vessel.

One of the petitioners, Vartholomeos, sought damages for alleged false imprisonment.

The owners and master of the vessel appeared generally and filed answers denying liability for each of the asserted claims. They also filed answers to certain interrogatories propounded by petitioners.

The testimony of the several petitioners was taken by deposition. Houmis, the master, and Alexandris on rebuttal, testified in open court before the trial judge. A jury was waived and all matters of law and fact, by consent, were submitted to the trial court which entered separate judgments in favor of each of the petitioners for these amounts with interest: Neapolidis, $200.60; Alexandris, $200.60; Liadis, $424.35; Vartholomeos, $184.

Asserting that the respective awards are inadequate and contrary to the law and the evidence, the several petitioners have sought and obtained a writ of error to the judgments below.

Since no point has been made, either in the court below or before us, as to the obvious misjoinder of the parties plaintiff and the causes of action, we shall treat the separate causes as having been properly consolidated and deal with them on the merits.

The incidents with which we are concerned occurred during three voyages of the vessel.

In October, 1947, the vessel, under Captain Houmis, left Marseille on what is referred to in the record as "Voyage No. 1", for a trip to Casablanca and thence to Mobile, where it arrived in November. At Mobile the members of the crew, including petitioners, were paid their earned wages from October 13 to November 12, less certain deductions to be dealt with later.

From Mobile the vessel sailed on "Voyage No. 2" to Belgium and thence to Baltimore. At the latter port the members of the crew were again paid their wages earned from the date of the last payment to December 27, 1947, less certain deductions.

From Baltimore the vessel sailed on "Voyage No. 3" to Bahia Blanca, Argentina, thence to Genoa, and thence to Newport News, where it arrived on May 12, 1948. Here against the members of the crew were paid their earned wages to May 12, less certain deductions. Neapolidis was paid off and discharged on that day and sent to the United States Marine Hospital at Norfolk for treatment for a venereal disease.

Upon arrival of the ship at Newport News the United States immigration authorities boarded the vessel and interviewed the members of the crew. Not being satisfied that Vartholomeos was entitled to apply for temporary admission to this country as a *bona fide* alien seaman, these authorities, pursuant to the statute and regulations, gave the master and agents of the vessel a written order directing them to detain this seaman on board.

Despite this detention order, when the ship sailed on the night of May 20 Vartholomeos was not aboard, the vessel departed without him, and he was signed off as a member of the crew. The amount of his earned wages for the period from May 13 to 20th was left with the immigration authorities and was subsequently received by him.

Alexandris and Liadis likewise failed to join the vessel before it sailed and consequently they were signed off as members of the crew. Money to pay the earned wages of these two seamen for the period from May 13 to 20, was left with the ship's agents at Newport News and was subsequently received by them. Shortly thereafter Liadis was sent to the United States Marine Hospital at Norfolk for an operation for hernia at the ship-owners' expense.

On May 20 the present action was instituted and the vessel

was permitted to sail upon the agreement of its local agents to post a bond in the sum of $4,000 to secure the payment of petitioners' claims.

Before the trial of the case below each of the petitioners had received the full amount of his earned wages. But each claimed that in addition thereto, pursuant to the terms of the "Collective Agreement" entered into between the representatives of the owners of the vessel and the Greek maritime unions, he was entitled to a "service bonus" up to the time he left the vessel.

The master testified that he paid each of these men the bonus to December 1, 1947, after which, he said, the owners had advised him that the provision of the "Collective Agreement" for the payment of this item had been terminated.

While this contention of the master is sustained by the opinion of Judge Bryan in *Capt. K. Papazoglou* (D. C., E. D. Va.), 1948 A. M. C. 1676, 1678, 1679 (affirmed on this point *sub nomine, Korthinos* v. *Niarchos,* C. C. A. 4, 175 F. (2d) 730),[1] in the case before us the lower court held that each of the petitioners was entitled to receive this bonus. It is conceded in the briefs on both sides that the judgments here under review include the correct amounts due the respective petitioners therefor.

Since the respondents have filed no cross-assignment of error to the finding of the lower court with respect to the allowance of the service bonus item, the correctness of that holding is not before us.

The petitioners, however, assign error to the action of the lower court in not allowing them liquidated damages or double pay under 46 U. S. C. A., § 596, for the delay of the master and owners in paying this item.

This section provides that: "Every master or owner who refuses or neglects to make payment * * * *without sufficient cause* shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed. * * * ." (Italics supplied.)

The Federal courts have uniformly held that this section, when read in connection with the succeeding section (46 U. S. C. A., § 597), applies to seamen on foreign vessels while in harbors of the United States who sue for their wages upon the

---

[1] See also, *Galaxias Steamship Co.* v. *Christofis* (King's Bench Division), 81 Lloyd's List (Law Reports) 500 (1948).

termination of the voyage. For example, see *The Sonderborg,* C. C. A. 4, 47 F. (2d) 723, 726, 727, *certiorari* denied, 284 U. S. 618, 52 S. Ct. 7, 76 L. ed. 527.

The claim here for double pay or liquidated damages on this item is entirely without merit. It is well settled that the refusal to pay because of a defense made and asserted in good faith, even though unsuccessfully, does not constitute a withholding "without sufficient cause" so as to subject the master and owners of the vessel to the penalty of this statute. See *The Velma L. Hamlin,* C. C. A. 4, 40 F. (2d) 852, 854, 855, and cases there collected; *Korthinos v. Niarchos, supra* (175 F. (2d) at pages 733-734).

Error is assigned to the action of the trial court in not allowing the petitioners full recovery for certain amounts which they testified the master had advanced to them on their unearned wages in violation of 46 U. S. C. A., § 599.

This section forbids paying any seaman his wages "in advance of the time when he has actually earned the same," and provides that the "payment of such advance wages" shall not "absolve the vessel or the master or the owner thereof from the full payment of wages after the same shall have been actually earned, and shall be no defense to a libel suit or action for the recovery of such wages." In terms the section is made applicable "to foreign vessels while in waters of the United States."

Each of the petitioners testified that after he had been paid his earned wages at Mobile in November, 1947, and again at Baltimore in December, the master made him cash advances in anticipation of the wages to be earned on the subsequent voyage. Liadis said that he received $100 on each of these occasions, Alexandris and Neapolidis said that each received $120 on each of these occasions, while Vartholomeos said that he received $100 at Mobile and $120 at Baltimore.

The master vigorously denied having made such advances, but the lower court decided this issue of fact in favor of the petitioners. It also decided that such advances were illegal and should not have been deducted from the wages of the seamen. Since there is no cross-assignment of error we are not here concerned with the correctness of that holding.

Although we find no support for it in the record, the briefs on both sides say that the lower court permitted the master and owners to offset the Baltimore advances to the extent of the

previous Mobile advances. This, it is said, was upon the theory that the advances last made should be applied to discharge the claims for the first illegal advances, with the result that the seamen were allowed to recover the advances made on one occasion only.

■ Since the present case was argued and submitted in the court below, the identical question has been passed upon by the United States Courts of Appeals for the Fourth and First Circuits. In *Korthinos* v. *Niarchos, supra* (175 F. (2d) at page 733), the Court of Appeals for the Fourth Circuit held that illegal advances made on a prior voyage could not be discharged by illegal advances subsequently made. It was pointed out that to permit this to be done would, in effect, limit the recovery of wages to the last voyage, although the seaman had not in fact been paid full wages for a previous voyage. A wage settlement, or even a release given by a seaman in settlement for wages, it was said, may be set aside for "good cause" under the express provisions of 46 U. S. C. A., § 597. To the same effect see *Mavromatis* v. *United Greek Shipowners Corp.*, C. C. A. 1, 179 F. (2d) 310, 317.

We concur in this view and accordingly hold that the lower court erred in not allowing the seamen to recover the illegal advances made on both of these occasions.

■ What was further said in *Korthinos* v. *Niarchos, supra,* likewise disposes of the petitioners' claim asserted before us that they should be allowed liquidated damages or double pay under 46 U. S. C. A., § 596, for the failure of the master to pay the full amount of their earned wages without deductions for such illegal advances. That opinion holds that "the failure to pay again the amount of advances after there has been a settlement in good faith and the amount of wages due the seamen has actually been paid with no question raised as to the legality of the advances," was not a failure to pay wages "without sufficient cause" so as to subject the vessel to a claim for double wages under the statute. (175 F. (2d), at pages 733, 734.)

Petitioners assign error to the action of the trial court in not requiring payment to them of the amounts which the master admitted in his answer to the interrogatories he had deducted from their wages for taxes and old-age pension contributions. The master testified that he was required by the laws of Greece to collect such taxes and contributions from the seamen and remit them to his government through the Greek consul.

The legality of such deductions was upheld in the second appeal of the case of *Korthinos* v. *Niarchos,* C. C. A. 4, 184 F. (2d) 716, 719. In answer to the same argument which was advanced to that court by the same counsel, it was there said: " * * * we know of no principle of law which would justify our ignoring such a requirement of the law of a foreign government with respect to the rights of its nationals serving as seamen on a vessel flying its flag and subject to its jurisdiction. The judge below relied upon the wage accounts and portage bills as evidence of the amount of the tax; and there is nothing to justify us in setting aside his finding with regard thereto."

Three of the petitioners, Alexandris, Liadis and Vartholomeos, next contend that they should have been allowed double pay or liquidated damages for the delay in the payment of their earned wages at Newport News for the period from May 13 to 20, 1948. The substance of their contention is that while they were signed off the crew list on May 20, they did not actually receive their wages until later. Alexandris and Liadis received their wages on May 24, and Vartholomeos received his on May 29.

Preparations were completed for the sailing of the vessel during the afternoon of May 20. The master was required to go to Norfolk on the ship's business and when he left the three men were aboard. Upon his return to the vessel at eight o'clock that night he was informed by the chief officer that these seamen had left the ship. Efforts to locate them were unavailing. After reporting the absence of the men to the immigration authorities the vessel sailed without the three men and they were signed off the crew's list as of that day.

Sufficient funds to pay the wages of Alexandris and Liadis were deposited with the ship's agents and were given to these two seamen as soon as they presented themselves for payment.

Although Vartholomeos had been ordered by the immigration authorities not to leave the vessel, he did so and was later apprehended and held for deportation. According to the statement of his counsel, this man was paid off "before the immigration officer" on May 29, and as soon as it was "feasible" to do so.

Under such circumstances we think the trial court was fully justified in finding that the master had not refused or neglected to make payment of the wages "without sufficient cause" so as to incur the penalty provided for in the statute.

Vartholomeos claims that he should have been allowed the

additional sum of $120, because, he says, he made an allotment of this amount to his family in Greece; that this was not done in the manner prescribed by the statute, and that hence it could not lawfully be deducted from his wages.

The statute (46 U. S. C. A., § 599) permits a "seaman to stipulate in his shipping agreement for an allotment of any portion of the wages he may earn" to certain members of his family, provided only such allotment be made "in writing and signed by and approved by the shipping commissioner." In terms the statute applies to "foreign vessels while in waters of the United States."

Vartholomeos testified that he gave the master $120 in cash at Baltimore, with the direction that it be sent to his (Vartholomeos') family in Greece.

The master gave a different version of the transaction. He said that the seaman gave him no money, but requested that he (the master) direct the owners of the vessel to forward $120 to his (the seaman's) family, and that he complied with this request.

Whether the transaction, as related by the master, is within the purview of the statute we need not decide. The petitioner, who was in the position of a plaintiff in a lower court, cannot complain if his version of the transaction be accepted as true. *Massie* v. *Firmstone,* 134 Va. 450, 114 S. E. 652.

Clearly, we think, the seaman's version of the transaction was not an "allotment" within the purview of the statute. It was not a stipulation "in his shipping agreement for an allotment" of earned wages. It was merely a request that the master receive the tendered cash and transmit it to the seaman's family.

Moreover, although there is no direct testimony on the subject, the trial court might very well have concluded that this sum of $120, which the seaman said he gave the master at Baltimore, was the identical money which the seaman claimed was illegally advanced to him at that port on his unearned wages, and which we here hold should be paid to him. It would be manifestly unfair to allow the seaman to recover this sum as an illegal advance and again as an illegal allotment.

Little need be said of the assignment of error by Alexandris, Liadis and Vartholomeos that they were entitled to damages for the failure of the master to return their seamen's books promptly to them and for failing to make proper entries therein showing their discharge.

The record shows that because these men had voluntarily left the ship shortly before it sailed their books were left with the ship's agents. On that date the agents wrote counsel for the seamen that the books of Alexandris and Liadis were available for immediate delivery to him. The agents also wrote that Vartholomeos' book was being delivered to the immigration authorities by whom this seaman had been ordered detained and deported.

Whether, under such circumstances, the master was required under Article 344 of the Greek Code to enter in the seamen's books that they had been ''discharged,'' we need not decide. There is no evidence whatsoever that any of these men sustained any damage by reason of the alleged delay in the receipt of the books or by the failure of the master to make an entry therein showing his ''discharge.''

Liadis and Neapolidis claim that they should have been allowed damages by the lower court because, they say, they were not given prompt medical treatment for injury and illness incurred while they were in the service of the vessel.

██ ██ ''It is an ancient and well-settled rule of the maritime law, sanctioned alike by sound policy and by intrinsic equity, that seamen are entitled to be cured at the expense of the ship and her owners of sickness or injury sustained in the ship's service. * * * The right conferred constitutes a part of the contract for wages, and is a material ingredient in the compensation for the labor and services of the seaman. The seaman's right to the expenses of his cure are not barred by the fact that his sickness or injury was incurred without fault on the part of the shipowner or his agents, * * *. The shipowner's duty extends, however, only to such care and attention as circumstances require or permit, and the question of its adequate performance is to be determined with reference to the facts of each particular case.'' 48 Am. Jur., Shipping, § 167, pp. 115, 116. See also, *Aguilar* v. *Standard Oil Co.*, 318 U. S. 724, 63 S. Ct. 930, 87 L. ed. 1107.

██ It is also well settled that where the master or owner of the vessel wilfully or negligently fails or delays to furnish the required maintenance and cure, the seaman may recover consequential damages flowing therefrom. 48 Am. Jur., Shipping, § 178, pp. 121-122; *Cortes* v. *Baltimore Insular Line*, 287 U. S. 367, 53 S. Ct. 173, 77 L. ed. 368.

Liadis testified that on the voyage from Belgium to Baltimore he sustained a hernia in the performance of his duties. Upon the arrival of the vessel at the latter port, he said, he reported the injury to the master who at first refused to let him go ashore for the purpose of seeing a physician. Finally he went to a physician, Dr. Jamison, who gave him a written statement reciting that he was suffering from a hernia. He does not claim to have shown the certificate to the master, or to have told him of his visit to this physician.

The master, on the other hand, testified that he took the seaman to another physician, Dr. Kelly at Baltimore, who reported to him (the master), as well as to Liadis, that he found no such disability.

After the vessel left Baltimore, Liadis again complained to the master of his condition. Upon the arrival of the vessel at its next port of call, Bahia Blanca, Argentina, he was taken to a physician who fitted him with a truss and the man continued on the voyage.

Although, as has been said, Liadis voluntarily left the ship at Newport News and could not be located at the time of its sailing on May 20, he subsequently communicated with the owners' agents at that port, and through their arrangement was sent to the Marine Hospital at Norfolk where his condition was corrected by a surgical operation at the owners' expense.

The judgment in favor of this seaman includes the sum of $243.75 which covered his maintenance and subsistence during his convalescence from the operation and after he had left the hospital. No complaint is made of the inadequacy of this allowance.

We are of opinion that the testimony of the master, which the lower court has accepted as true, amply supports the finding that this officer was guilty of no misconduct or negligence in furnishing medical attention to this seaman.

It may be observed, also, that there was no evidence whatsoever that this seaman suffered any aggravation of his injury or other consequential damages by reason of the alleged delay in being furnished medical treatment.

Neapolidis testified that he contracted a venereal disease which first manifested itself two days after the ship had sailed from Argentina on its voyage to Genoa and thence to Newport News. While the vessel was at Genoa he reported his condition to the first mate, but instead of asking for medical treatment at

the expense of the owners, the seaman advised this officer that he would seek such treatment on his own account.

This seaman did not tell the master of his condition until after the ship had reached Newport News where he was examined and his condition disclosed by the physicians of the United States Public Health Service. Upon being advised of the seaman's condition, the master immediately paid him off and had him sent to the Marine Hospital at Norfolk where he was treated at the owners' expense from May 13 to 17, and "discharged as fit for duty."

Even if it had been the obligation of the vessel to furnish this seaman medical treatment for a disease of this nature (compare *Aguilar* v. *Standard Oil Co., supra,* 318 U. S., at page 731), there is nothing in the circumstances we have related, or elsewhere in the record, to show that the master either wilfully or negligently failed to furnish such medical treatment with reasonable promptness.

Vartholomeos claims that he should have been awarded damages for the act of the master in detaining him on board from May 12 to 20, at Newport News, pursuant to the direction of the United States immigration authorities, as related above.

The argument here is that the detention order was not in the precise form required by the statute and regulations, was "manifestly void," and that the master and owners are liable in damages for having held him pursuant thereto.

The lower court was right in rejecting this claim. The same argument by the same counsel was considered and recently rejected by the United States Court of Appeals for the Fourth Circuit. In *Papagianakis* v. *Steamship Samos,* C. C. A. 4, 186 F. (2d) 257, it was held that the vessel, her master and owners were not liable for damages for false imprisonment for keeping a seaman on board in obedience to a similar detention order issued by the immigration authorities. As the opinion points out, the failure of the master to obey such a detention order may result in the imposition of a heavy fine upon the vessel.

The final assignment of error, which we need consider, is that the conduct of the master toward the petitioners was such as to constitute their "discharge without sufficient cause," and that consequently they are entitled to "severance pay" and passage money to Greece.

Article 361 of the Greek Code provides in substance that a

seaman "discharged without sufficient cause" at a port in the United States is entitled to "four months' pay" and the cost or means of "repatriation."

But here there is no showing that any of these petitioners was discharged without sufficient cause. As already stated, only Neapolidis was actually discharged, and this at his own request. The other three petitioners breached their contract of employment and voluntarily left the ship shortly before it sailed.

Clearly, then, the lower court was right in rejecting their claims for severance pay and cost of repatriation. See *Capt. K. Papazoglou, supra* (1948 A. M. C., at page 1678).

The judgments complained of will be modified to include in the award to each of the petitioners the following additional amounts unlawfully advanced to them and improperly deducted from their wages, with legal interest thereon from November 14, 1949, until paid: Neapolidis, $120; Alexandris, $120; Liadis, $100; Vartholomeos, $100. As so modified the judgments will be affirmed.

The appellants having substantially prevailed on this appeal on one of their causes of action, and the appellees having substantially prevailed here on the appellants' other causes of action, the costs of the appeal will be divided. Code, Sec. 14-178.

*Modified and affirmed.*