McCrory Corporation, et al. *v.* Istre

No. 43428      April 5, 1965      173 So. 2d 640

*Heidelberg, Woodliff & Franks, Scott Tennyson,* Jackson, for appellants.

*Sebe Dale, Jr., Hall, Callender & Dantin,* Columbia, for appellee.

JONES, J.

Appellee, Mrs. Whitney Istre, sued appellant, McCrory Corporation, et al., in the Chancery Court of Marion

County, Mississippi. The suit was by attachment, Mc-Crory Corporation being a nonresident defendant. Slander was alleged, and after the hearing of the case, the chancellor rendered a judgment in favor of appellee for the sum of $5,000. Hence this appeal. We affirm the case.

Appellant, McCrory, operated a mercantile establishment in the City of Columbia under the name of Mc-Lellan's. The co-appellant, Valentine, was manager of the store.

There was an active chamber of commerce in the City of Columbia and there were about 175 businessmen or business houses that were members of this chamber of commerce. In order to assist the businessmen in matters involving bad checks, shoplifting, etc., the organization had adopted what they called a telephone alert system. This was revised in May 1963 (which was prior to the occurrence here involved) and a notice of such revision was forwarded to the members and appears in the record of this case, as follows:

This system was designed for the purpose of notifying the chamber of commerce members of *bad check artists, shoplifting, or suspicious characters* in Columbia. If everyone on the list will cooperate in making their assigned telephone calls, the majority of the community will be notified in the space of five to ten minutes, possibly saving hundreds of lost dollars to our merchants. . .

This notice then provided that after the chamber of commerce was notified regarding anything indicating characters as hereinbefore mentioned, the chamber of commerce would notify five subscribers, and each one so notified would notify three, and each of those three would notify three more, so that within five or ten minutes the whole town would be notified and have knowledge of it.

The testimony of the appellee showed that she had lived in the City of Columbia with her husband and children for two years prior to the incident here involved. As a matter of fact, she had been born and reared in Marion County, but had lived away from there until about two years prior to the occasion here described. Her husband was employed as a derrick hand by Chesley-Pruitt Drilling Company, was engaged in drilling oil wells. For the two years they had been in Columbia, they had maintained a joint bank account at the Citizens Bank of Columbia. On the day before the occurrence here involved, she had given a check to McLellan's Store for $2.25, which check was okeyed by the co-defendant, Valentine. On the morning of August 10 she and her husband went to the Citizens Bank where they deposited his pay check, less $5.00, the amount of the deposit being $306.39. Previous to that deposit they had to their credit $4.19.

After making such deposit, they went to some of the stores in Columbia shopping and eventually came to McLellan's. School was scheduled to begin soon and they wanted to obtain some school supplies. They entered McLellan's around 11:30 A.M.; they purchased a book sack for their little girl, a small toy for each of the twins, a picture frame, and possibly some paste and crayolas. They brought the articles selected to the checkout counter where the clerk totalled the amount due, which was $5.01. Appellee gave a check for this amount and was told that she would have to wait to have it approved. She and her husband stood around, just walking and looking, while waiting. When the clerk and Mr. Valentine came from the rear of the store, she returned to the checkout counter, where the clerk put the check in the register and then handed her the purchases in a paper bag. They saw Mr. Valentine standing near the front of the store and her husband asked about some smoking pipes. Mr. Valentine pointed out the counter

where they were displayed. Mr. Istree looked but they were not the kind he wanted, and they thereupon left the store. It was disputed by the defendant that Mr. Valentine was there at the time, but the chancellor found that appellee had fully sustained all of her allegations.

It will be noted that the check was for the exact amount due for the articles purchased. No money or change was requested. The check bore the signature of the appellee, the number of her account at the bank, as well as her address.

The answer of the defendant, and the same was followed in the proof by the defendant, was that the clerks in the store advised the complainant that neither of them was authorized to approve checks, and before the check could be accepted and the sale consummated it would be necessary to take the check to the office in the rear of the store in order that it might be approved or disapproved. When the check was presented to Miss Morgan who was in the office, she placed a telephone call to the bank and inquired if the complainant had sufficient funds on deposit to cover the check. It is stated that the bank advised Miss Morgan that appellee did not have on deposit *sufficient funds* to cover the check, and it is alleged that when the clerk went from the office to the main floor for the purpose of returning the check, the complainant had left and taken the merchandise with her. Then the answer alleges that a short time thereafter, Paul Valentine, the manager of the store, returned, and upon being advised of the occurrence, took the check, carefully examined it and personally called the bank. The answer then says: ''Said bank, acting by its duly authorized agent and servant, stated to the defendant Valentine that the complainant *did not at that time have on deposit sufficient funds* to cover said check.'' (Emphasis supplied). Shortly thereafter the defendant Valentine advised the chamber of commerce of the occurrence.

The answer of defendant says that he truthfully and accurately advised of the events "stating that on two occasions the aforesaid Citizens Bank had advised the corporate defendant that the check tendered by the complainant to the defendant was drawn without sufficient funds to cover it." He also furnished the chamber of commerce with a description of the complainant. It will be noted that the appellee had lived in Columbia for two years; that the day before Valentine had okeyed a check for her; that her account number and address were on the check; and the check was given only for the amount of the little merchandise that had been purchased. It is further noted that the memorandum relative to the telephone alert system provided that it was designed to notify the members of "bad check artists, shoplifting, or suspicious characters in Columbia."

The appellee had never been in any trouble of any kind prior to this time. It was explained by the bank that the reason appellant got the impression he did was that when he called, the bank, as was its custom, looked on the ledger which showed only $4.19 to the credit of appellee because any deposits made that morning had not been entered on the ledger. The bank employees testified that it was their custom to always tell the person who called the bookkeeping department to inquire about a check that that was according to the ledger and did not include checks deposited and not entered on the ledger. Appellant did not take time to present the check to the bank for payment. However, when presented a few days later, the check was paid. Valentine knew that when he called the chamber of commerce, it would be circulated over the system that this lady had given a bad check, and, as a matter of fact, it was so circulated, together with her description including the way she was dressed.

Valentine testified that he was thoroughly familiar with the telephone alert system; he had a copy of the memorandum of it in his office; he well knew and un-

derstood that when a bad check artist, a shoplifter, or a suspicious character is reported on the system, if all the calls are made as provided for in the memorandum, the information would be immediately transmitted to as many as 175 stores and business houses with numerous employees; and he said that it was his purpose and intention that this should happen when he did it.

Valentine first denied that he considered her a bad check artist, but when asked why he reported the incident, he said: "Well, I didn't want anybody else in town to lose merchandise or money as it appeared that I had done." He was then asked the following questions:

"Q. So, you did consider her a bad check artist; that she might write bad checks at some other stores?

"A. In that sense, yes, sir.

"Q. Did you consider her to be a shoplifter?

"A. No, sir.

"Q. Or a suspicious character?

"A. No, sir.

"Q. And when you did this, Mr. Valentine, you well knew that all the other merchants and businessmen in Columbia who would have this report transmitted to them would also consider this lady as a bad check artist, didn't you?

"A. Yes, sir."

Defendant admitted that the following week he found the check which he had reported as a bad check was in fact a good one, and the store got its money. When he found the check was good and that the store had gotten its money, he said he felt no duty or responsibility to do anything about what had been done on Saturday; that he did not call the chamber of commerce and tell them he was wrong; and he did not call any merchants to correct the chamber of commerce report. He said: "I didn't make an effort to correct it, no, sir."

The first time appellee heard about the report against her was on the Wednesday following the day it happened. Her husband had stopped at Beecham's Super Market and there learned of it. He came home, told her, and the next morning she went to Beecham's Super Market herself. There she spoke with Mr. Beecham and found a memorandum taped on the cash register which Mr. Beecham told one of the ladies to give to her. It read: "Mrs. Whitney Istre, Citizens Bank, Account 350249, late thirties or early forties, tall and slim, wearing a yellow dress." As a matter of fact, the lady was less than thirty years old.

On the same day that she went to Beecham's, she also went to McLellan's to see Mr. Valentine and showed him the slip of paper she had received from Beecham's. She asked if he was responsible for it and he said, "yes." When she asked why, his answer was: "Because I got stuck with one of your bad checks and I didn't want somebody else to do it, some of the rest of the merchants here in town." She then said: "You were not stuck, as you put it. Didn't you get your money for this check?" Valentine answered that he did, but that he wasn't worried as much about that as he was in getting some more of the bad checks that he had received paid off. She again told him that she had not issued any bad checks, and he said, "All right, all right! What would you have me do? Get down on my knees?" The appellee then left the store because she felt there was no use talking to him about correcting the matter.

After this she went to another store, The Rankin Company, on Main Street in Columbia and purchased some merchandise. She had all four of her children with her that day, the twins being in a twin stroller. She made her purchases and gave the clerk a check which was sent to the office. She was then given the package, but when she left the store and had reached the street the clerk came out of the store, called her

back, and told her she would have to go back to the office. Appellee went to the office and she says, of course, it was very embarrassing and humiliating to her. (This incident occurred on a Saturday about the middle of September.) In the store office, she talked to Mr. Thomas Rankin and he told her that he had a call from the chamber of commerce not to accept any checks she might issue. She says he would not accept her check.

Appellee asked Mr. Rankin to call Sebe Dale, Jr., her attorney, which he did, and after talking to Mr. Dale, Mr. Rankin accepted her check and she left the store. She testified that she was embarrassed, humiliated, ashamed and in tears over the incident, and went then to Mr. Dale's office, arriving there still crying. She stated she has had no further reports about the matter because she has stayed out of places where she is not known; that if she does not have cash to pay she does not go in any store that does not know her; that the account at the bank has been maintained since about November 1962; and that Mr. Valentine has never at any time retracted or caused to be retracted the report that he published on her.

On September 24, 1963, about six weeks after the occurrence happened, the chamber of commerce, in its news bulletin issued that day, undertook to apologize to the appellee, but itself confused the facts when it said:

> The chamber office apologizes to Mrs. Whitney Istre for sending an alert call out on her last month when she mistakenly overchecked her account and a merchant called in stating a bad check had been received. As it turned out she did only overcheck as all of us do from time to time. Please do not call the chamber or police department on a person who has an account in one of our local banks. The system is really worth its trouble if it is understood and used correctly. Please change your records on Mrs. Istre.''

This apology itself accused her of overdrawing her account, which was incorrect.

Our statute on so-called bad checks is Mississippi Code Annotated section 2153 (1956), as amended by chapter 282, Laws of 1958. Its title is "False Pretenses — Bad Checks," and it provides:

> If any person, with intent to defraud, shall make, issue and deliver to another person, for value, any check, draft or order on any bank or other depository and thereby obtain from such other person any money, goods or other property of value, and have no funds or have insufficient funds on deposit to his credit in such bank or depository with which such check, . . . may be paid, . . . he shall be guilty of a misdemeanor, or a felony, as is hereafter specified, . . ."

This statute then provides that for the first offense where the amount is less than $25.00, a person is guilty of a misdemeanor and upon conviction may be punished by a fine of not less than $25.00 nor more than $500.00, or by imprisonment in the county jail for a term of not less than five days nor more than six months, or by both fine and imprisonment. Upon commission of a third or more offense regardless of the amount of the check, the person so committing the offense shall be guilty of a felony and subject to punishment in the state penitentiary for a term of not less than one nor more than five years. Where the check is more than $25.00 regardless of the number of offenses the party is guilty of a felony and subject to imprisonment in the state penitentiary.

The telephone alert system of the chamber of commerce provided for the reporting of "bad check artists." In his own testimony the defendant Valentine eliminated the question of shoplifting and suspicious characters and confined his report to the chamber of commerce as one reporting a bad check artist. As hereinbefore shown, Mr. Valentine stated that he well knew the other

merchants and businessmen in Columbia who would have this report transmitted to them would also consider this lady a bad check artist. He further stated that he did not want any other businessmen to lose money on her bad checks, thereby evidencing that he considered her one who was in the habit of issuing bad checks.

The defendant Valentine further testified that after he received the report from the bank stating she did not have sufficient funds at that time to pay the check, "I sat down, looked at the check, examined it, and thought of the matter, deliberated over it and finally decided to report it." He made no effort to ascertain anything relative to the lady or her character or financial responsibility, although her address was on the check, and he learned from the bank she did carry an account there.

We cannot imagine a greater wanton or reckless disregard for the rights of an individual, and this was, as stated, after deliberation — no act on the spur of the moment. His action as well as his testimony evidences an absolute disregard for the appellee's good name. He not only failed, after learning of his error, to take a single step to rectify the situation, but when she approached him and talked to him about it, he apparently became indignant and angry. Of course, the people to whom the matter was reported under the telephone alert system regarding bad check artists did not know the amount of the check, or how many bad checks the appellee had given; they only knew that under their system she was classified as a bad check artist, one highly skilled and accomplished in the issuance of bad checks, and impliedly one who was in the habit or custom of issuing bad checks, and thereby obtaining money or property under false pretenses in violation of the criminal laws of this state.

■■ ■ His entire actions evidence malice. It was said in Kroger Grocery & Baking Company v. Harpole, 175 Miss. 227, 166 So. 335 (1936):

Malice in fact relates to the state or condition of the mind of a person who speaks defamatory words. It includes an intention to injure, hatred, or ill will, but is not limited thereto, and appears if words of the character here under consideration were spoken wantonly and in disregard of a civil obligation, i.e., if they were spoken recklessly without knowing or caring whether they were true. This is in accord with practically all of the authorities.

We think the chancellor had a right to consider all the facts and circumstances surrounding the utterance of the words in question, and that considering the facts hereinbefore stated, there can be no doubt that the words and actions of the defendant were slanderous per se. Taylor v. Standard Oil Co., 184 Miss. 392, 186 So. 294 (1939); Illinois Central R. Co. v. Wales, 177 Miss. 875, 171 So. 536 (1937).

If actionable per se, general damages need not be proved but are presumed to result. Travis v. Hunt, 224 Miss. 193, 79 So. 2d 734 (1955); Natchez Times Publishing Co. v. Dunigan, 221 Miss. 320, 72 So. 2d 681 (1954).

Appellant claims that his communication was privileged because the telephone alert system was something installed for the benefit of the members of the chamber of commerce of which he was a member. In 53 C.J.S., Libel and Slander section 97 (1948), at page 153, it is provided:

The protection of a qualified privilege may be lost by the manner of its exercise, although belief in the truth of the charge exists. The privilege does not protect any unnecessary defamation. In order for a communication to be privileged, the person making it must be careful to go no further than its interests or his duties require. Where the person exceeds his privilege and the communication complained of goes beyond what the occasion demands that he should

publish, and is unnecessarily defamatory of plaintiff, he will not be protected, and the fact that a duty, a common interest, or a confidential relation existed to a limited degree is not a defense, even though he acted in good faith.

In Sumner Stores of Mississippi, Inc. v. Little, 187 Miss. 310, 325, 192 So. 857, 862 (1940), it is stated:

Each case of slander must be settled upon its own facts and circumstances. This court has several times held that although there is qualified privilege, that privilege may not be exercised to excess. As we view the case, we think there was no evidence upon which the jury could have found that Rabins had probable cause for accusing Little of stealing the shoes. He was hasty, intemperate, and, according to his own admissions, which we have set forth in the statement of facts, there was no basis for the charge no matter when he discovered that the shoes had not been delivered by Little. It would have been so easy for him to ascertain that they had never been wrapped and sent out; that they were still in the stock of merchandise. He selected Little as the offending party rather than the wrapping clerk or the salesman.

▮▮ In the case at bar we do not think the defendants could have had any reasonable or probable cause to believe that appellee was a bad check artist as covered in the agreement between the members of the chamber of commerce. We think, therefore, he exceeded the privilege, and, further, that the testimony herein shows he did not act in good faith, but that he acted with malice.

In 53 C.J.S. *Libel and Slander* section 100, at page 158, it is stated:

A qualifiedly privileged communication is inconsistent with the existence of express or actual malice; as discussed supra § 90, it requires both an occasion of privilege and the use of that occasion in good faith,

and is actionable if actuated by express malice. If the matter is qualifiedly privileged, then express malice or malice in fact is necessary or essential to warrant recovery.

■■ While the appellee here showed special damages in at least two instances, at Beecham's Super Market and at The Rankin Company, the action and words of the defendants are held by us to have been actionable per se and it was not necessary for her to prove special damages.

We hold that the chancellor was amply justified in the decree that he rendered and the case is therefore affirmed.

Affirmed.

*Lee, C. J., and Brady, Patterson and Inzer, JJ.,* concur.