## Richmond

### THE KROGER COMPANY, ET AL. v. JEAN YOUNG.

March 9, 1970.

Record No. 7033.

Present, All the Justices.

*James F. Johnson* (*Leonard G. Muse; Woods, Rogers, Muse, Walker and Thornton*, on brief), for plaintiffs in error.

*John M. Goldsmith; Max Jenkins* (*C. Tabor Cronk; Goldsmith & Jenkins*, on brief), for defendant in error.

CARRICO, J., delivered the opinion of the court.

This appeal involves an action for slander and use of insulting words brought by Jean Young, the plaintiff, against The Kroger Company and Avery Pendleton, the defendants. A jury trial resulted in a verdict in favor of the plaintiff in the sum of $25,000.

The verdict was approved by the trial court, and we granted the defendants a writ of error.

The evidence shows that Kroger operated a supermarket at Christiansburg, Virginia, and that the defendant Pendleton was the manager of the store. The plaintiff was employed as a part-time cashier, operating a cash register at one of the check-out counters in the store.

In the latter part of 1965, Kroger discovered an unusually large "inventory shrinkage" or deficit in the amount of cash receipts for a specified period as related to the retail value of merchandise charged to the store. There was ordinarily a certain amount of inventory shrinkage due to breakage, spoilage, and other factors. However, in the period in question, the amount had more than tripled, representing a loss of approximately $10,000.

In an effort to ascertain the cause of the shortage, Kroger called in an independent investigative agency to survey the operation of the store. The agency, a Texas concern under contract to Kroger, sent a team of investigators to Christiansburg headed by A. C. Byram. Byram and his associates conducted an investigation and as a result, obtained a written confession from Ann Chandler, one of the cashiers, stating that she had taken approximately $500 from the cash registers over a period of time. In her confession, Mrs. Chandler implicated the plaintiff in the theft and stated that the plaintiff had taught her how to remove money from the cash registers illicitly.

On December 15, 1965, the plaintiff, who was not working that day, was called to the store from her home. She was taken into a conference room and interrogated by Byram in the presence of Harry M. Holtman, manager of operations for Kroger. According to the plaintiff, Byram asked her if she "had ever been dishonest," and when she replied in the negative, he pointed to his brief case and said he had witnesses and evidence that she "had been dishonest." The plaintiff called upon Byram to produce the witnesses, and he called Ann Chandler into the room. Mrs. Chandler said to the plaintiff, "I have confessed. If you have done anything, tell them. They just want to help you." The plaintiff merely said to Mrs. Chandler that she "was sorry for her."

Mrs. Chandler was sent from the room, and Byram continued to urge the plaintiff "to admit to being dishonest." She kept telling him she "hadn't been dishonest." Finally, she was told she could

go home and she would be advised "in two or three days" of the outcome of the investigation.

The plaintiff returned to her home, and when her husband arrived from work, she told him "what had happened." He went to the store and asked the defendant Pendleton for "his side" of "what happened." According to the husband, Pendleton said that "they had proof that [the plaintiff] had been taking money out of the till, and failing to ring up purchases."

Several days after the foregoing incidents, Connie Strictler, a part-time cashier in Kroger's Blacksburg store, was approached by B. W. Black, zone manager for Kroger. Black requested Mrs. Strictler to transfer to the Christiansburg store. She asked him if she "would get forty hours" per week because she "wanted a full-time job." According to Mrs. Strictler, Black said that Kroger "needed a full-time girl at Christiansburg, because they had to get rid of two of the girls over there for taking money. Mrs. Strictler further testified that although Black did not name anyone, she later learned that the plaintiff was one of "the two girls."

When some time had passed and the plaintiff had not been called back to work by Kroger, two officials of her union called upon Black seeking her reinstatement. In the conference, Black stated, according to the union officials, that he would not reinstate the plaintiff because "he could not have anyone working on the cash registers that he could not trust."

The plaintiff was finally permitted by Kroger to return to work on February 22, 1966, but she was not placed on cashier duty. Instead, she was employed in the dairy department of the Christiansburg store and later was transferred to the Radford store, where she became head dairy clerk.

To support her action for slander and use of insulting words, the plaintiff relied upon the statements made to her by Byram, the statements made to her husband by Pendleton, and the statements made to Connie Strictler and the union officials by Black. The trial court ruled that the statements made to the plaintiff, to her husband, and to the union officials were subject to qualified privilege. The trial court further ruled that the statements made to Connie Strictler were not so privileged.

On appeal, the parties agree that the statements made to the plaintiff herself and to the union officials were subject to qualified privilege. However, the defendants have assigned error to the re-

fusal of the trial court to rule that the statements made by Black to Connie Strictler were likewise qualifiedly privileged. And the plaintiff has assigned cross-error to the court's ruling that the statements made by Pendleton to her husband were privileged.

We are of opinion that the court erred in ruling that the statements made by Black to Connie Strictler were not qualifiedly privileged. The statements are in the category of communications by an employer to his employees of the reason for the discharge of a fellow employee. That such communications are qualifiedly privileged was the precise holding in *Peoples L. Ins. Co.* v. *Talley*, 166 Va. 464, 186 S.E. 42 (1936).

In the *Talley* case, the home office of the insurance company received an anonymous letter severely critical of its local manager at Portsmouth, Virginia. The letter was forwarded to the local manager who had the writing compared with specimens of Talley's handwriting. The manager, believing that Talley had written the anonymous letter, discharged him despite his professions of innocence. In a weekly meeting of the employees of the local agency, the manager stated that "undercover work" would not be tolerated and that Talley had been discharged for engaging in such "work."

The statement made to the employees was held to be subject to a qualified privilege. In so holding, we said that the manager was "merely acting in conformity with his duty, and for the protection of his own interests and the interests of his company, in stating to his employees on the occasion in question that neither he nor his company would stand for any undercover work in the office, and that Talley had been let out for that reason." 166 Va. at 470, 186 S.E. at 44.

The same type of communication was dealt with in *Brown* v. *Norfolk & W. R. Co.*, 100 Va. 619, 42 S.E. 664 (1902). There, Brown, an employee, was discharged by the railway. The railway published an order stating that Brown had been discharged "for intimating that an officer of the company had cast reflections upon the ancestry of another officer, which was proved to be untrue." Brown sought damages for publication of the order. The order was held to be qualifiedly privileged. We stated that it was "due to [Brown] and all concerned that the reason for his discharge should be given, so as to fix the blame where it belonged, and to exonerate those who were innocent." 100 Va. at 622-623, 42 S.E. at 665.

Here, Black was legitimately protecting his employer's business

interests when he told Mrs. Strictler that the reason for her transfer to the Christiansburg store was that Kroger had discharged "two of the girls over there for taking money." In view of the large shortage which had been uncovered and of the continuing investigation, it was reasonable for Black to inform Mrs. Strictler of what had occurred to impress upon her the necessity for her own meticulous handling of company funds. And Mrs. Strictler was entitled to know the reason for the discharge of a fellow employee whose place she was asked to fill.

■ We are further of opinion that the trial court did not err in ruling that the statements made by Pendleton to the plaintiff's husband were qualifiedly privileged. While we have not decided the question, courts of other jurisdictions have held that defamatory communications made to a member of the family of a defamed party are ordinarily subject to qualified privilege. *Faber* v. *Byrle*, 171 Kan. 38, 44, 229 P.2d 718, 723 (1951); *Conner* v. *Taylor*, 233 Ky. 706, 708-709, 26 S.W.2d 561, 562 (1930).

In *Restatement of the Law of Torts*, § 597 (2), p. 258 (1938), the following rule is set forth:

> "An occasion is conditionally privileged when the circumstances induce a correct or reasonable belief that
>
> (a) facts exist which affect the well-being of a member of the immediate family of the recipient or of a third person, and
>
> (b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of such person's well-being and
>
> (c) the recipient has requested the publication of the defamatory matter or is a person to whom its publication is otherwise within generally accepted standards of decent conduct."

In the comments upon the rule, it is pointed out that the fact that a request is made for information "is of importance" in determining whether privilege attaches to a defamatory communication made to a member of the defamed person's family.

Here, the plaintiff's husband went to Pendleton, the store manager, and requested the latter to relate "his side" of "what happened." According to the husband, Pendleton gave him the information he requested—information which affected the interests of the plaintiff—under circumstances reasonably prompting a reply by Pendleton. That the husband sought the information so that he might protect the well-being of the plaintiff cannot be the subject of dispute. Therefore, the requirements of the Restatement rule, which we here adopt, were met. Accordingly, the trial court properly held the communications to the husband to be subject to qualified privilege.

Thus, the four communications upon which the plaintiff relied were all subject to qualified privilege. That being true, she was entitled to recover only upon a showing that the statements were made with malice. *Elder* v. *Holland,* 208 Va. 15, 23, 155 S.E.2d 369, 375 (1967); *Story* v. *Newspapers, Inc.,* 202 Va. 588, 590-591, 118 S.E.2d 668, 670 (1961).

The plaintiff contends that she produced sufficient evidence of malice to carry her case to the jury. The defendants, on the other hand, say that the trial court ruled that there was no evidence of malice on their part. The plaintiff, countering, argues that while the trial court made "remarks . . . to the effect that there was no evidence of actual malice," such "remarks were clearly of no moment, if in fact there was evidence on which a finding of malice could be based."

The difficulty with the plaintiff's position is that the trial court did more than merely remark upon the lack of evidence of malice. The court specifically ruled that there was "no malice in the case." The court made that ruling in refusing to give the plaintiff an instruction (No. 5) dealing with the circumstances under which malice might be inferred and in refusing the plaintiff another instruction (No. 6) on punitive damages.

The plaintiff has not assigned cross-error to the court's ruling that there was no evidence of malice in the case. The ruling has, therefore, become final, and the question of its correctness is not before us. *Buchner* v. *Edwards Co.,* 210 Va. 502, 171 S.E.2d 676 (1970); *Neapolidis* v. *Theofana Maritime Co.,* 192 Va. 90, 96, 63 S.E.2d 795, 799 (1951). Accordingly, we have not set out the evidence which the plaintiff claims was sufficient to show malice.

Since the communications relied upon by the plaintiff were quali-

fiedly privileged and the case comes to us as one lacking in evidence of malice, it follows that the judgment of the trial court must be reversed, the jury's verdict set aside, and final judgment entered for the defendants.

*Reversed and final judgment.*