Richard **GARZIANO**, Plaintiff-Appellee,

v.

**E.I. DU PONT DE NEMOURS & CO.**, Defendant-Appellant.

No. 86–4025.

United States Court of Appeals, Fifth Circuit.

June 3, 1987.

**382**

Alex A. Alston, Jr., Jackson, Miss., for defendant-appellant.

Joe Sam Owen, Ben F. Galloway, Gulfport, Miss., for plaintiff-appellee.

Before GARZA, WILLIAMS and GARWOOD, Circuit Judges.

GARZA, Circuit Judge.

This case concerns the operation and scope of qualified privilege available as a shield to a libel and slander action when an employer publishes a statement on company policy to its employees coupled with the company's explanation for a former employee's dismissal.

I

Richard Garziano, plaintiff-appellee, was employed at defendant-appellant Du Pont's plant in DeLisle, Mississippi, as a maintenance technician from May 31, 1979 until July 21, 1981. Mr. Garziano was terminated in 1981 due to an alleged incident of sexual harassment.

On Friday, July 17, 1981, Garziano and another maintenance employee, William Strayham, were assigned to a "shut-down" operation in one area of the plant. Due to the unbearable heat that day, the shift was scheduled to end at 2:00 p.m. so that no employees would pass out on the job. At approximately 1:30 p.m. the maintenance crew supervisor, Dan Seliga, instructed Garziano and Strayham to go to "chemical unloading" at the north end of the plant because two other maintenance employees, Charles Crawford and Donna Matheny, needed some assistance. Crawford and Matheny were working on a blocked silocate line, and acid had ruined some sections of the connecting pipe and insulation.

About five minutes before 2:00 p.m., Matheny went to get the maintenance crew's pick-up truck and drove it back to chemical unloading so the crew could haul the stripped insulation and sections of pipe back to the repair shop. At this point, the sequence of events is sharply disputed between Garziano and Matheny.

According to Matheny, when she returned to chemical unloading with the pick-up truck the crew loaded the insulation and pipe into the back of the truck and then Crawford and Strayham jumped in the back. Garziano made a sexually abusive comment[1] to Matheny and climbed into the cab of the pick-up. Garziano slid over next to Matheny and began to make loud noises and grab at her while enroute to the repair shop. Matheny was trying to get Garziano to stop this while she was driving to the dumpster at the back part of the shop when Garziano "reached over at that point and put his hand on the back of my neck and ran his fingers in my hair...." Matheny abruptly stopped the truck short of its destination and jumped out, hurriedly walking away from the truck and disappearing into the shop.

According to Garziano, when Matheny returned to chemical unloading in the pick-up truck she didn't get out of the truck to help load the pipe and insulation into the back. After the three men loaded the tools and equipment into the truck, Garziano got in the cab and "slid to the middle of the truck" because "Crawford was right behind me, and he began getting in [the cab] with me." Crawford then said he would ride in the bed of the truck with Strayham and jumped in the back. When Crawford didn't get in the cab, Garziano slid back over to the passenger seat and closed the door. Garziano denies touching or verbally abusing Matheny. Garziano says that Matheny did stop short of the trash bin where the crew was going to dump the pipe and insulation that could not be salvaged. Garziano and Crawford both told Matheny to back the truck up to the dumpster, but she told them to "do it themselves" and

1. As the crew finished loading the truck, Garziano allegedly told Matheny that if she took off in the truck and left him he "would pull out every pussy hair on her body."

went into the shop area. Garziano said that one of the men was going to "report" Matheny for this, but none of them did.

Mrs. Matheny came in Monday morning, July 20, 1981, and voluntarily resigned her position as a maintenance employee at Du Pont. As a matter of course, Du Pont conducts exit interviews with all employees who leave the company, and Matheny was interviewed Monday afternoon by employment supervisor Larry Talbert and asked several questions about her experience at the plant. Although initially hesitant, Mrs. Matheny described her version of the incident that had occurred on July 17, 1981. Matheny also informed Talbert of an earlier instance where Garziano had attempted to touch her between the legs with his foot when seated across from her at a conference table during a maintenance crew safety meeting. Matheny explained that she quit because "women are not made to feel like a part of the team unless the men can have their way with them, and no one does anything about it." While Matheny complained of general harassment from "the men," the only individual specifically mentioned was Richard Garziano.

Du Pont considered this charge "very serious" and began an investigation. The following morning Du Pont interviewed Garziano and the two other employees, Crawford and Strayham, who were alleged to have some knowledge of the truck incident.[2] Garziano denied Matheny's allegations completely. Neither Crawford nor Strayham could entirely confirm or deny the events related by Matheny. Both

Crawford and Strayham said that they did not hear Garziano say anything to Matheny before he entered the cab of the pick-up, but both told the Du Pont officials investigating the incident that they did not sit facing the cab, so neither one saw anything that may have transpired. Both employees did state that Matheny had stopped short of the dumpster and had hustled into the shop area. After consultation with a number of supervisory employees, management confirmed that Matheny had reported Garziano's alleged harassment at the maintenance crew safety meeting to her supervisor, Dan Seliga, and she had previously spoken to the mechanical supervisor, Jack Taylor, about Richard Garziano's abusive language and demeanor towards her.[3] Several meetings were held that day to discuss the company's response.[4] Finally, the plant manager discussed this situation with legal counsel and the home office in Delaware and then dismissed Garziano.

Both parties agree that Garziano's discharge caused a number of rumors to circulate at Du Pont's plant. According to Du Pont, a number of employees expressed "hypothetical concerns" about what constituted sexual harassment and whether an innocent bumping or touching of a female employee would constitute grounds for dismissal. Other employees asked, specifically, the reasons for Garziano's termination. Du Pont issued Management Information Bulletin No. 27–81 in response to these concerns. The introductory paragraph to the bulletin entitled *Sexual Harassment* stated:

---

2. Garziano testified at trial that he named three other employees who could vouch for his story—Ceil Conway, Sandra Johnson, and Michael Melton were supposed to be in the area. Du Pont officials examined at trial stated that Garziano never mentioned these other employees to the management officials investigating the incident.

3. Dan Seliga testified at trial that Matheny had reported Garziano's attempt to touch her under the table. Seliga said that he considered Garziano's "kicking" as merely "horseplay" and took no further action. Taylor testified that although Matheny identified Garziano by name, she asked Taylor not to do anything because "her job would be in jeopardy" and "she would have a harder time than she was having now."

4. The management personnel at Du Pont who participated in the decision to terminate Richard Garziano included Dave Settle, plant manager; Phil Michael, assistant plant manager; William Price, senior supervisor of employee relations; Ken Waid, employee relations superintendent; Larry Talbert, employment supervisor; Dennis McNamara, mechanical superintendent; Terry Cain, senior supervisor; Jack Taylor, mechanical supervisor; and R.D. Butler in the personnel department at Du Pont's corporate headquarters in Wilmington, Delaware. Garziano's immediate supervisor, Dan Seliga, was not consulted because he was on vacation that day.

The recent sexual harassment incident which resulted in an employee's termination has raised supervisory and employee questions about the subject. This particular incident was determined to be a serious act of employee misconduct, but in deference to the employees involved cannot be discussed in detail. However, deliberate, repeated, and unsolicited physical contact as well as significant verbal abuse was involved in this case.

The bulletin went on to define sexual harassment as described in regulations issued by the Equal Employment Opportunity Commission (EEOC).[5] Management Information Bulletin (MIB) 27–81 was distributed to approximately 140 supervisors with instructions to cover the key points in the bulletin with all of their employees.[6] The bulletin was read verbatim to some employees and summarized to most other employees, but no evidence exists to show that the bulletin was posted on bulletin boards or distributed to employees. Garziano did obtain a copy of the bulletin. Though not mentioning him by name, the introductory paragraph referred to the reasons for Garziano's dismissal. Garziano subsequently brought an action against Du Pont for libel and slander.[7]

Du Pont denied the material allegations of the complaint but admitted that it had indeed issued Management Information Bulletin 27–81 and that the first paragraph was intended to refer to Garziano. However, Du Pont moved for summary judgment on the basis of a qualified privilege protecting communications between employers and employees. The district court denied this motion. During the trial Du Pont made several motions for a directed verdict on the grounds that MIB 27–81 was protected by a qualified privilege as a matter of law and that Plaintiff had failed to produce clear and convincing evidence that Defendant issued and published the bulletin in question with actual malice or in bad faith. The trial court reserved ruling on those motions and ultimately sent the case to the jury. On August 15, 1984, the jury returned a verdict in favor of Garziano and awarded him $93,000 in compensatory damages. The jury denied Garziano's request for punitive damages in a special interrogatory finding Du Pont exhibited no malice, recklessness or wanton disregard for Garziano's rights in publishing the bulletin. After the jury rendered a verdict, Du Pont sought a judgment notwithstanding the verdict or, alternatively, a new trial. Assessing the jury's verdict in view of the law on libel and slander in Mississippi, the district court judge explained that:

"Du Pont may have had an interest in telling its employees what would be considered sexual harassment; however, this interest could more likely have been achieved by less sweeping statements than those which were included in the bulletin. Telling employees what sexual harassment is and telling them who had been fired for it are two quite different things, as the jury apparently concluded.

\* \* \* \* \* \*

---

5. The entire bulletin is included as Appendix A.

6. The evidence at trial established that matters of employee discipline are regularly kept confidential as long as that person is employed at the plant. However, once an employee is terminated, the discipline of that employee is no longer secret; management then communicates to its supervisors the basic reasons behind an employee's discharge so the message can be relayed to all other employees.

DuPont utilizes a number of different means to communicate with its employees. Face-to-face discussions and group meetings (like the safety meeting) are held periodically. Several types of bulletins are also issued at the plant. General bulletins dealing with safety, health and the environment are received and posted on bulletin boards around the plant. An Employee Information Bulletin (EIB) is issued and posted when management wants to communicate matters of general interest to its employees. A Management Information Bulletin (MIB) is distributed in envelopes only to supervisors and is to be read or "interpreted" by the supervisors to the employees—it is not posted at the plant. The management information bulletin at issue here is the most restrictive form of communication in place at the DuPont plant. However, MIB's are not rare. The notation 27–81 indicates that, by mid–July, this was the twenty-seventh MIB issued in 1981.

7. The libel charge stems from Du Pont's publication of MIB 27–81 to its supervisory employees. The slander claim stems from the supervisors' statements to the employees.

[T]he jury had the discretion, as this Court so instructed, to consider whether or not the privilege existed and if the privilege existed, whether or not it was abused. *The jury apparently concluded that privilege either did not exist or if it did exist, it was abused.* Thus, plaintiff was not required to prove actual malice, as the defendant suggests.[8]

The trial court denied Du Pont's motions and entered final judgment on the basis of the jury's verdict, finding that "this is not a case where the facts and inferences point so strongly in favor of defendant Du Pont that reasonable persons cannot arrive at a contrary verdict," the only circumstance under which granting either one of Du Pont's motions would have been warranted. Du Pont challenges that conclusion in this appeal.

## II

The Mississippi State Constitution guarantees Mississippi citizens the right to sue for damage to reputation. Miss. Const. Art. 3, § 24. The rule of law in Mississippi governing a determination of libel or slander is well established:

Any written or printed language which tends to injure one's reputation, and thereby expose him to public hatred, contempt or ridicule, degrade him in society, lessen him in public esteem or lower him in the confidence of the community is actionable per se.

*Ferguson v. Watkins,* 448 So.2d 271 (Miss. 1984); *Natchez Times Publishing Co. v. Dunigan,* 221 Miss. 320, 72 So.2d 681 (1954); *Conroy v. Breland,* 185 Miss. 787, 189 So. 814 (1939). However, while Mississippi recognizes a cause of action for defamation *per se,* the language alone is not conclusive. Mississippi law recognizes a qualified privilege as a shield against defamation claims as a matter of public policy.

The law guards jealously the right to the enjoyment of a good reputation, but public policy, good morals, the interests of society, and sound business demand that an employer, or his representative, be permitted to discuss freely with an employee, or his chosen representative, charges made against the employee affecting the latter's employment. On such occasions there is a qualified privilege, and statements made within the scope of that privilege, in good faith and without malice, are not actionable.

*Bush v. Mullen,* 478 So.2d 313, 314 (Miss. 1985); *Killebrew v. Jackson City Lines, Inc.,* 225 Miss. 84, 82 So.2d 648, 650 (1955). The leading case on the existence of the qualified privilege in the employer-employee context, *Louisiana Oil Corp. v. Renno,* 173 Miss. 609, 157 So. 705 (1934), sets forth the standard that controls the operation and scope of the privilege: "A communication made in good faith and on a subject-matter in which the person making it has an interest, or in reference to which he has a duty, is privileged if made to a person or persons having a corresponding interest or duty, even though it contains matter which without this privilege would be slanderous, provided the statement is made without malice and in good faith." *Id.* 157 So. at 708. In *Renno* the Mississippi Supreme Court considered whether a supervisory employee who explained to other employees that Renno was dismissed because he was a "bootlegger" was a communication which enjoyed a qualified privilege. The court held that "[t]he question of privilege is for the court on a given state of facts; if the facts are undisputed the court decides the question and instructs the jury peremptorily; if the facts are disputed, the court submits the question to the jury to determine whether the necessary facts existed." *Id.* The issue here is how this rule of law is applied.

Du Pont contends that its communication to its employees, Management Information Bulletin (MIB) 27–81, was protected by a qualified privilege as a matter of law, and that the district court's failure to so instruct the jury was reversible error. Du Pont argues that there are two separate and distinct issues with regard to a qualified privilege. The first issue is whether the *occasion* for a statement is a matter of

---

8. Civil Action S–81–0427–(R) (Dec. 18, 1985)

(emphasis added).

qualified privilege. The second issue is whether the *exercise* and *use* of the privilege was improper. According to Du Pont, a court must first make the decision whether or not a communication enjoys a qualified privilege based on facts relating to the creation or existence of the privilege. If the facts are undisputed that the communication occurred on an occasion of qualified privilege, then the jury must be so instructed before they decide whether that privilege was abused or overcome by actual malice. Garziano maintains that the facts here are disputed as to whether or not the qualified privilege exists; therefore, relying on the rule articulated in *Renno,* Garziano concludes that the district court properly submitted the question on the existence of the privilege to the jury. Our analysis of the *Renno* case and subsequent decisions construing the operation and scope of the qualified privilege in Mississippi convinces us that the district court failed to correctly instruct the jury that the communication at issue here was published on an occasion of qualified privilege.

After setting forth the standard used to evaluate qualified privileges in *Renno,* the Mississippi Supreme Court explained that the "undisputed facts" showed that the supervisor's statement concerning the discipline and termination of an employee "was properly a matter for consideration and discussion" at a meeting of all employees and, consequently, the Court found the occasion privileged. 157 So. at 708. Only after determining that the *occasion* was privileged did the *Renno* Court evaluate whether the privilege was overcome by malice or bad faith. *Id.* A few years after *Renno,* in *Gardner v. Standard Oil Co.,* 179 Miss. 176, 175 So. 203 (1937), an agent of Standard Oil was charged with slander when he made statements about missing property to other employees, implying that Gardner had stolen it. The court reviewed the circumstances surrounding the case and stated that the agent "had an interest and a duty" in acting to protect the property of his principal—Standard Oil. 175 So. at 205. Since the statements were made while furthering the company's legitimate interests, they were protected by a quali-

fied privilege. In *Scott-Burr Stores Corp. v. Edgar,* 181 Miss. 486, 177 So. 766 (1938), the manager of appellant's store followed a customer out of the store, grabbed him, and charged him with shoplifting. Though the words uttered by the manager were slanderous *per se,* the Court held that the manager had a duty to investigate his good faith belief of theft and both the manager and customer had a mutual interest in the proper resolution of the matter. The *Scott-Burr* Court used a bifurcated analysis "to determine, first, whether the occasion complained of ... was one of qualified privilege, and, second, if qualifiedly privileged, whether appellee proved actual or express malice by competent evidence...." *Id.* 177 So. at 769.

There is a crucial distinction between disputed or undisputed facts relevant to the existence of a qualified privilege and disputed or undisputed facts submitted to the jury on the ultimate question of liability. The jury, of course, decides whether the publication is false and defamatory and has the exclusive province to award damages on the basis of contested facts, but those are the ultimate facts necessary to determine liability. The *Renno* Court's admonition requiring a peremptory instruction on "undisputed facts" means the facts related to the *existence* of the privilege—facts determining whether the occasion of the statement created the privilege as a matter of law. Our review of Mississippi cases and other authorities shows that Courts have employed a bifurcated analysis to determine: 1) whether the occasion calls for the creation of a qualified privilege; and, if so, then 2) whether that privilege is overcome by malice, bad faith, or abuse. *See, e.g., Bush v. Mullen,* 478 So.2d 313, 314 (Miss. 1985) (Mississippi recognizes qualified privilege with regard to "communications between employers and employees"); *Hooks v. McCall,* 272 So.2d 925, 927 (Miss.1973) (qualified privilege exists between those with direct interest in same matter; no cause of action without malice); *Southwest Drug Stores of Mississippi, Inc. v. Garner,* 195 So.2d 837 (Miss.1967) (although occasion was one of qualified privilege be-

cause of interests involved, privilege was lost by unreasonable actions which exceeded privilege); *Miley v. Foster*, 229 Miss. 106, 90 So.2d 172, 174 (1956) (insurance agent had business duty to send letter to local insurance agent about a policy in which both had an interest). *See also* Prosser & Keeton on Torts (5th Ed.1984) § 115 (question of privilege to be determined by the court); Restatement (2d) of Torts § 619 (court determines whether the occasion gives rise to a privilege; jury determines whether privilege is overcome or abused); R. Sack, *Libel, Slander, and Related Problems* 339 (1980). If the facts are undisputed as to the interest or duty of one who publishes a defamatory statement to other interested parties, then the qualified privilege attaches.

That the occasion of a qualified privilege differs from a determination that the exercise or use of the occasion was abused was made clear in *J.C. Penney Co. v. Cox*, 246 Miss. 1, 148 So.2d 679 (1963). A store employee was charged with false arrest, false imprisonment and defamation when he wrongfully accused a customer of shoplifting and subjected her to "great indignities, humiliation, and disgrace." 148 So.2d at 681. While finding the jury award of $2,000 supported by the law and evidence, the Mississippi Supreme Court made clear the analytical distinction.

> "In considering a qualified privilege, a clear understanding of the distinction between the terms of occasion of the privilege and [the actual language used] is necessary. An occasion of privilege arises when the evidence establishes circumstances which the law says supported a duty to make a statement of fact honestly believed to be true. A privileged communication is a statement made in good faith with an honest intent to perform a duty, on an occasion of

privilege. Thus it is possible that a statement made on occasion of privilege may not be a privileged communication".[9]

■ Du Pont's communication to its employees, MIB 27–81, was issued on an occasion of qualified privilege. Co-workers have a legitimate interest in the reasons a fellow employee was discharged.[10] *Benson v. Hall*, 339 So.2d 570, 573 (Miss.1976); *Renno, supra*, 157 So. at 708; *Gardner, supra*, 175 So. at 205. Of course, employees have a strong interest in not being fired. An employer also has an interest in maintaining employee morale and protecting its business interests. *Holliday v. Maryland Casualty Co.*, 115 Miss. 56, 75 So. 764, 765 (1917) (defamatory letter circulated by insurance company to all its agents held qualifiedly privileged since it was clearly promulgated for defendant's business interests); *see also Gaines v. CUNA Mutual Insurance Society*, 681 F.2d 982, 986 (5th Cir.1982) (qualified privilege protects employer-employee communications because of "public policy that recognizes the need for free communication to protect business and personal interests"). Du Pont's Employee Handbook explicitly condemned sexual harassment at the plant. Moreover, federal law imposes a specific duty upon employers to protect the workplace and the workers from sexual harassment, including redressing known occurrences of sexual harassment. *See* Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.; 29 C.F.R. § 1604.11(e) (EEOC regulations). In fact, EEOC regulations specifically and unequivocally state:

> Prevention is the best tool for the elimination of sexual harassment. An employer should take all steps necessary to prevent sexual harassment from occurring, such as affirmatively raising the

---

**9.** 148 So.2d at 682 (citing Libel and Slander—Exceeding a Conditional or Qualified Privilege, Miss.L.J. 18 (1946–47), p. 319).

**10.** This is consistent with the rule in other jurisdictions. *See, e.g., Knight v. Baker,* 173 Ind.App. 314, 363 N.E.2d 1048, 1051 (1977) (all employees have common interest in operation and atmosphere of workplace); *Kroger Co. v. Young,* 210 Va. 564, 172 S.E.2d 720, 723 (1970) (employ-

ees had interest in situation of co-employee and handling of company funds); *Hall v. Rice,* 117 Neb. 813, 223 N.W. 4, 5 (1929) (communication to all clerks in store informing them another clerk was discharged for embezzlement was privileged); R. Sack, *Libel, Slander, and Related Problems* 306 (1980) (communications about conduct of co-employee privileged).

subject, expressing strong disapproval, developing appropriate sanctions, informing employees of their right to raise and how to raise the issue of harassment under Title VII, and developing methods to sensitize all concerned.

*Id. Cf.* Restatement 2d of Torts § 598 (1977) (privilege exists if one reasonably believes public interest requires the communication). The Supreme Court has also recently held that employers have an affirmative duty to eradicate "hostile or offensive" work environments, *Meritor Savings Bank v. Vinson,* —— U.S. ——, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (employer may be held liable for failing to remedy known occurrences of abusive sexual harassment in the workplace). State and federal law both condemn sexual harassment as a matter of public policy.[11]

We hold that Du Pont issued the management information bulletin on an occasion of qualified privilege because: 1) Du Pont believed it had a legal duty to do so; 2) the bulletin was necessary to inform employees of Du Pont's policy against sexual harassment; and 3) employers are protected in communicating on matters of "common interest" with employees. The facts essential to the creation of a qualified privilege stand uncontroverted. Therefore, a qualified privilege should have been recognized as a matter of law.

III

Once it is determined that the *occasion* for the publication of a defamatory statement is one of qualified privilege, then a presumption of good faith arises. *Killebrew v. Jackson City Lines, Inc.,* 225 Miss. 84, 82 So.2d 648, 650 (1955); *Louisiana Oil Corp. v. Renno, supra,* 157 So. at 708. Though in dispute about when the qualified privilege is created, both parties agree that once the existence of a qualified privilege is established the burden is upon the plaintiff to prove bad faith, actual malice, or abuse of the privilege through excess publication. "In the absence of proof that the words were spoken by motives of spite, ill will, malicious purpose or with a wanton and reckless disregard of whether the words were true or false, the privilege of the occasion was not destroyed." *Killebrew v. Jackson City Lines, supra,* 82 So.2d at 650. We must now determine whether this case should be remanded for a new trial or rendered on the facts as presented.[12]

Mississippi requires "actual or express malice, as distinguished from malice in law,"[13] which exists when one "with a sedate, deliberate mind and formed design injures another, ... is actuated by ill will in what he does and says, [or has] a design to willfully or wantonly injure another." *Hayden v. Foryt,* 407 So.2d 535, 539 (Miss. 1982); *Scott-Burr Stores Corp. v. Edgar,*

---

**11.** In light of the national interest in a peaceful and harmonious work environment, some courts have held that employer-employee communications are absolutely privileged. *See, e.g., General Motors Corp. v. Mendicki,* 367 F.2d 66 (10th Cir.1966) (granting unqualified privilege to defamatory statements made in collective bargaining and grievance procedures as support for national labor policy (citing *Linn v. United Plant Guard Workers of America,* 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966)); *Brooks v. Solomon Co.,* 542 F.Supp. 1229 (N.D.Ala.1982) (defamatory statements made by management to employees and union officials absolutely privileged "in order to prevent impairment of national labor policy").

**12.** *Compare Hayden v. Foryt,* 407 So.2d 535 (Miss.1982) (reversed and rendered due to plaintiff's failure to establish requisite proof to overcome qualified privilege); *Hooks v. McCall,* 272 So.2d 925 (Miss.1973) (same) *with Bush v. Mullen,* 478 So.2d 313 (Miss.1985) (reversed and

remanded for further development of facts necessary to overcome privilege); *Tipps Tool Co. v. Holifield,* 218 Miss. 670, 67 So.2d 609, 618 (1953) (reversed and remanded because instructions allowed jury to "disregard the fact that the occasion on which the statements were uttered was occasion of qualified privilege"). *See also Greenbelt Cooperative Publishing Association v. Bresler,* 398 U.S. 6, 11, 90 S.Ct. 1537, 1540, 26 L.Ed.2d 6 (1970) (libel case reversed and remanded because "erroneous instructions to the jury" made it "impossible to know, in view of the general verdict returned whether the jury imposed liability on a permissible or impermissible ground").

**13.** The definition of malice in Mississippi encompasses both express or common law malice (spite, ill will, malicious purpose) and actual malice as explained in *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

181 Miss. 486, 503–04, 177 So. 766, 770 (1938) (quoting Newell on Libel and Slander, 4th Ed. § 271 *et. seq.*). In other words, although the language used makes it defamatory *per se,* "where the occasion is one of qualified privilege malice is not implied; and the burden of proving the existence of malice is cast upon the person claiming to have been defamed." *Tipps Tool Co. v. Holifield,* 218 Miss. 670, 67 So.2d 609, 618 (1953) (citing four previous Mississippi Supreme Court decisions). The proof of malice must also be clear. It is not sufficient "that the evidence be consistent with the existence of actual malice, or even that it raise a suspicion that the defendant might have been actuated by malice or a doubt as to his good faith. It must *affirmatively prove* the existence of actual malice, and to do so it must be more consistent with the existence of actual malice than with its non-existence." *Hayden v. Foryt,* 407 So.2d at 539; *Scott-Burr, supra,* 177 So. at 771–72 (quoting *Rosenberg v. Mason,* 157 Va. 215, 160 S.E. 190, 202 (1931)) (emphasis added).

### Malice and Bad Faith

■ Garziano relies upon several "facts" which support a jury verdict in his favor on the question of bad faith or malice. First, Garziano maintains that the statement describing "deliberate, repeated, and unsolicited physical contact as well as verbal abuse was involved in this case" was false—that at no time did he physically or verbally harass Matheny. While a plaintiff must show that a statement is false and defamatory in order to recover damages in a defamation action, *Fulton v. Mississippi Publishers Corp.,* 498 So.2d 1215 (Miss. 1986), the question of truth or falsity is inapposite here—only if the statement was known to be false or published with malice can Garziano prevail. *Benson v. Hall,* 339 So.2d 570, 572 (Miss.1976); *Killebrew v. Jackson City Lines, Inc., supra,* 82 So.2d at 650. False and defamatory statements are protected by a qualified privilege if made without malice and in good faith.

Second, Garziano challenges Du Pont's assertions of good faith and honesty, and he questions the depth of the investigation into the sexual harassment charges. Garziano contends he was never given an opportunity to refute the charges of sexual harassment: he was interviewed for approximately thirty minutes and then kept separated from other employees until Du Pont dismissed him; he was never informed of Matheny's complaint about the "safety meeting" incident; he was not given an opportunity to present any witnesses on his behalf; he testified he advised a supervisor to check with three employees who could verify that he did not make the sexually abusive comment to Matheny (though no one could have seen what went on in the cab of the pick-up other than Crawford and Strayham), and Du Pont did not investigate or interview the employees mentioned by Garziano. Garziano's point is that his inability to call witnesses on his behalf and challenge Du Pont's contemplated dismissal of him conclusively shows bad faith and ill will.

■. Mississippi follows the employment-at-will doctrine. Under Mississippi law, Du Pont could have discharged Garziano for any reason or no reason at all. *Kelly v. Mississippi Valley Gas Co.,* 397 So.2d 874 (Miss.1981); *Montgomery Ward & Co. Inc. v. Skinner,* 200 Miss. 44, 25 So.2d 572 (1946). The fact that he was fired, in and of itself, is not evidence of malice, and the jury would not be justified in awarding damages only because they felt he was wrongfully terminated. The record clearly reflects that Du Pont received a report of sexual harassment from Ms. Matheny, a person who was deemed highly credible because she had nothing to gain from the statement. Du Pont promptly began an investigation and discovered other incidents of harassment involving Garziano had been previously reported. The decision was made to question Garziano and the two witnesses mentioned by both Garziano and Matheny.[14] The statements by Crawford

---

**14.** It is uncontroverted that Garziano and Matheny both stated that fellow employees Crawford and Strayham had knowledge of the incident.

As previously discussed (see footnote 2), Garziano testified that he named three other employ-

and Strayham were ambiguous. Having made inquiry of the employees that both Garziano and Matheny indicated had knowledge of the incident, Du Pont was confronted with a choice of believing Garziano or Matheny. After a series of closed meetings involving a number of management employees, Garziano was dismissed.

■ The fact that Garziano was sequestered apart from other employees does not imply bad faith on Du Pont's behalf. It is as equally plausible that Du Pont used Matheny's allegations as a pretext for its "hidden agenda" to fire Garziano as it is likely that Du Pont believed Garziano would talk to fellow employees and "discover" eyewitnesses to corroborate his denial of the alleged sexual harassment incident. That Du Pont questioned Garziano and then carefully kept him separate from all other employees does not undermine the presumption of good faith. On the contrary, any reasonable inference drawn from these events would indicate that Du Pont was careful in its assessment of Matheny's allegations.

■ Third, Garziano believes that Du Pont harbored resentment against him due to a grievance filed for sick leave pay in March or April of 1981. The grievance was denied.[15] Garziano took his grievance to his supervisor, Dan Seliga, then Seliga's boss, Jack Taylor, and then to Dennis McNamara, and finally to the plant manager, Dave Settle, who also denied the grievance. When Garziano talked to Settle, Garziano stated that union representation for plant employees might be necessary. Settle allegedly stated that he chose not to rule on the grievance "with a gun [union] pointed at my head." Certain supervisors allegedly told Garziano to "watch his p's and q's" and said "future conduct of this nature could lead to disciplinary action." Sometime after the grievance was denied, Garziano testified that he was singled out and required to report to his supervisor

before and after his lunch break because he ate lunch off of company property, and he believed this requirement was not enforced on other employees. This procedure was a hardship on Garziano because it took time away from his one-half hour lunch break. This is cited as evidence which tends to show Du Pont "had it in" for Garziano.

However, this isolated event is insufficient evidence to overcome the presumption of good faith and affirmatively prove the existence of actual malice or bad faith in publishing MIB 27–81. Garziano himself testified he "got along with his superiors" in general, and he had previously received a commendation from Du Pont for informing management that a bolt had dropped into a product that was being packaged for sale. More importantly, Garziano's constant focus on the "injustice" of his discharge misses the key point. The defamation case before us today does not concern the validity of Garziano's discharge. We are concerned with whether Du Pont management honestly and sincerely believed Donna Matheny's allegations of sexual harassment. The record indicates that Garziano is concerned with his wrongful discharge—the action taken, not the good faith belief of Du Pont management in Matheny's allegations. There is insufficient evidence in the record to support the allegations of malice or bad faith.

Fourth, Garziano argues, and contends this argument was successful before the jury, that the introductory paragraph of MIB 27–81 merely repeated information about sexual harassment available in the rest of the bulletin. The difference is that the first paragraph of the bulletin specifically accuses Garziano of sexual harassment; the rest of MIB 27–81 repeats the legal definition of sexual harassment in an advisory tone. Garziano asserts that the first paragraph defaming him was wholly unnecessary to inform the employees about

---

ees to vouch for him, a claim disputed by Du Pont.

**15.** Apparently, Garziano called in sick but did not follow Du Pont's company procedures in doing so. Du Pont called Garziano's house sev-

eral times that day but no one answered. Garziano said that he was either asleep or at the drugstore and his wife worked out in the backyard and was unable to hear the phone.

what constitutes sexual harassment and was inserted only to maliciously defame him. Garziano claims that no other employee could have had an interest in knowing the reasons for his dismissal.

We reject this argument. As prior Mississippi case law and federal civil rights laws make clear, *all* employees have an interest in a non-discriminatory work environment. *Meritor Savings Bank v. Vinson,* — U.S. —, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (review of legislative history supporting Title VII and pertinent EEOC regulations); *Rogers v. EEOC,* 454 F.2d 234 (5th Cir.1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972); *Gardner v. Standard Oil,* 179 Miss. 176, 175 So. 203 (1937). Du Pont had an interest and duty to serve in informing each and every one of its employees about the subject. *See, e.g., Benson v. Hall,* 339 So.2d 570, 573 (Miss.1976) (privileged since limited to those persons with a legitimate and direct interest in subject matter). All employees, not just supervisors, are subject to discharge for sexual harassment.

■ While no single factor in evidence affirmatively demonstrates bad faith, we are urged that the totality of the evidence was enough to reach the jury. This Court is mindful of the fact that it takes a certain quantum of evidence to overcome a *presumption* of good faith:

> If the evidence adduced is equally consistent with either the existence or the non-existence of malice, there can be no recovery, for there is nothing to rebut the presumption which has arisen in favor of the defendant from the privileged communication ... [the evidence] must affirmatively prove the existence of actual malice.

*Hayden v. Foryt,* 407 So.2d at 539.

That presumption is not overcome today. Even if we assume the combination of facts

alleging ill will or spite were present, it was not enough to defeat the qualified privilege. The law looks to the *primary* motive or purpose by which the defendant apparently is inspired in examining whether the privilege is overcome. Prosser, Law of Torts § 115 (1984); Restatement (2d) of Torts, § 603.

The primary motivating factors for the communication at issue here are factually legitimate. Du Pont had an affirmative duty to eradicate any possible intimidating or hostile work environment caused by sexual harassment. The trial judge, in his opinion denying Du Pont's motions for judgment *non obstante veredicto* or, alternatively, a new trial, stated that the evidence indicated that the motivating factor for Du Pont's publication of the bulletin, with its introductory paragraph referring to plaintiff's discharge, was to defend the position of Du Pont and the termination of plaintiff. That is a justifiable reason, in and of itself, for privileged communications. Since the bulletin was clearly issued for a proper purpose, any ill will was incidental and the qualified privilege protected the publication. In fact, by answering the special interrogatory on punitive damages,[16] the jury specifically found there was no malice by Du Pont. Without affirmative proof of spite, ill will, or malice, Garziano fails to overcome the presumption of good faith.

### Abuse of the Privilege

■ The law also allows a jury to find that a qualified privilege was abused by excessive publication. There are two ways to abuse a qualified privilege. First, the defense of qualified privilege may not be invoked if the scope of the statements exceeded what was necessary. The language used "must be careful to go no further

---

**16.** The standard of proof set forth in the instruction on punitive damages read:

> You are instructed that punitive damages may be awarded only if you are convinced by a fair preponderance of the evidence that the defendant in publishing the alleged defamatory statements was motivated by actual or express malice; that is, conscious ill will or personal spite toward the plaintiff.

The instruction included both actual malice and express (common law) malice, the same burden of proof needed to overcome the qualified privilege. The jury answered the special interrogatory asking whether the defendant acted "with reckless and/or wanton disregard of plaintiff's rights in publishing the defamatory management information bulletin" in the negative.

than [the declarant's] interest or duties require." *McCrory Corp. v. Istre,* 252 Miss. 679, 173 So.2d 640, 646 (1965). Secondly, a qualified privilege does not protect a defamatory statement where there is excessive publication to persons not within the "circle" of those people who have a legitimate and direct interest in the subject matter of the communication. *Hayden v. Foryt, supra,* 407 So.2d at 536; *Love v. Commercial Casualty Insurance Co.,* 26 F.Supp. 481 (S.D.Miss.1939).

Although the qualified privilege does not provide a defense if the scope of the statement exceeded what was necessary, the fact that Du Pont "used strong words ... is no evidence of malice. The fact that the expressions are angry and intemperate is not enough; the proof must go further and show that they are malicious." *Scott-Burr Stores Corp. v. Edgar,* 181 Miss. 486, 177 So. 766 (1938). In essence, the statement is not privileged if the person claiming the privilege could have done all his interest or duty demanded without defaming the plaintiff. According to Garziano, there was no need for Du Pont to inform all 140 supervisors and all 400 employees of the sexual harassment incident.

However, as we previously discussed, an employer's publication to its employees of the reasons for discharge of a co-worker is not only a proper purpose, but is one of the most fitting occasions for application of a qualified privilege. Garziano strongly contends that Du Pont abused the privilege by using the precise legal definition of sexual harassment in the introductory paragraph if the second and third paragraphs were going to do no more than repeat the legal definition *sans* the allegation defaming him. The accusation that Garziano was guilty of "deliberate, repeated, and unsolicited physical contact as well as significant verbal abuse" is termed "unnecessary" when the nondefamatory portion of the bulletin adequately defined sexual harassment.

The repeated use of language in the bulletin supports the finding that Du Pont exercised the privilege only insofar as necessary. Du Pont did not describe the alleged sexual harassment incident in detail, nor did the company independently attempt to characterize Garziano's conduct other than in the precise words used by the EEOC. The language in the bulletin makes clear the difference between sexual harassment and casual interaction, and MIB 27–81 does make clear that an employee *will* be fired for sexual harassment. Again, as we have explained, Garziano's argument assumes that Du Pont's employees have no interest in sexual harassment at the plant. The law recognizes that an employer's and employees' interests and duties coincide when the conditions of employment are implicated. We reject Garziano's argument on this point as contrary to law and public policy.

Garziano also claims that the number of people informed about his discharge is proof that the privilege was abused by excessive publication. Garziano points to testimony elicited on cross-examination which purportedly shows that employees of an independent contractor, Brown & Root, were knowingly read the contents of the bulletin.[17] The other proof introduced at

17. The entire testimony pertaining to the dissemination of MIB 27–81 at Du Pont's plant is as follows:

[Mr. Owen, Counsel to Garziano]
Q: Other than Du Pont employees, are there any employees working at the Du Pont plant on July 24, 1981? For example, Brown & Root employees?
[Larry Talbert, Du Pont Supervisor]
A: Yes, I would say there would [sic] been someone.
Q: How close together did the Brown & Root employees and the Du Pont employees work?
A: Some of them work right beside each other.

Q: If there was any conversation in that area by Du Pont employees it would be heard by anybody working the area?
A: It's possible.

Mr. Owen continued this line of questioning with another supervisor, Dan Seliga.
Q: [W]hat other employees were in the plant area there other than Du Pont employees? [Seliga]
A: Other than Du Pont?
Q: What other companies work in that immediate area?
A: Brown & Root.
Q: Did they work closely with Brown & Root?

trial relevant to publication was a statement from one of Du Pont's supervisors that he told his wife about Garziano's discharge and Garziano's testimony that his ten year old daughter came home from school and asked him if he had raped a woman at Du Pont.

An employer is entitled to use a "proper means of communication" concerning the defamatory matter to the person to whom it is privileged. Restatement 2d of Torts, § 604. "The test of publication is: Were the words spoken in such a tone or manner and under such circumstances that the defendant had a reasonable expectation that no one would hear the words" except those with a legitimate interest in the matter. *Smith v. Jones*, 335 So.2d 896, 897 (Miss. 1976). The testimony in the record is equivocal and speculative on this point. Du Pont was aware that workers from Brown & Root were present at times on the premises. The record does show that two witnesses testified that it was possible conversations among Du Pont employees *could be* overheard in general, but these witnesses did not establish that the explanation of MIB 27–81 *was* overheard. One of Du Pont's supervisors testified that there was talk about Garziano's termination in Gulfport, Mississippi, approximately twenty miles from the plant. This evidence does not affirmatively prove that the bulletin itself was delivered outside the protected circle of employees by Du Pont, but giving every reasonable inference to Garziano, it is possible that the privilege was abused on this occasion.

■ The fact remains that Du Pont used its most restrictive form of communication in this instance. Copies were not given to any employees but were distributed under cover only to supervisors, who were instructed to cover the key points in the bulletin with the employees. The information was never posted at the plant, nor does the evidence show it was distributed to any persons outside the plant.[18] The fact that Du Pont is a large employer, having an operation consisting of 140 supervisors and approximately 400 employees, should not unjustly penalize Du Pont. The number of employees who share a common interest in qualifiedly privileged communications neither diminishes the importance of that interest nor adversely affects the existence of the privilege. *Renno, supra*, 157 So. at 708. Du Pont had an interest and duty in informing each and every one of its employees about the subject. *See, e.g., Benson v. Hall*, 339 So.2d 570, 573 (Miss.1976). Of course, the inherent danger that information relayed to Du Pont employees on any issue might find its way outside the plant through idle gossip does exist. The transcript of the trial is replete with evidence of rumors existing at the plant *prior* to the publication of the bulletin stating the reasons for Garziano's discharge. It is unclear from the record whether the extensive rumors at the plant and in neighboring Gulfport were the product of supervisors discussing the contents of MIB 27–81 with persons outside the "circle" of interested employees, or whether the rumors were only routine scuttlebutt due to Garziano's discharge. There is an important distinction between talk of Garziano's termination in general, which occurred before MIB 27–81 was ever issued, and Du Pont's publication of the contents of the bulletin to parties outside the protected circle of qualified privilege. Liability for defamation may be premised only upon the latter.

■ We find Du Pont's use of its most restrictive means of written communication to inform the supervisors of Garziano's discharge reasonable as a matter of law. Otherwise, employers responding to legit-

A: Right along side.
Q: Would that be on a daily basis?
A: Normally.
Q: Do you know if any Brown & Root employees got copies of these bulletins?
A: They should not.
Q: Do you know if they heard the contents of that bulletin read by the supervisor to a crew member?

A: I can't answer that.

**18.** The record does not reveal the status of the person who provided the bulletin to Garziano, leaving us (and the jury) to speculate whether he was a supervisor or employee and whether the bulletin was obtained by legitimate or surreptitious means.

imate concerns in the workplace will either be discouraged from addressing sensitive matters or held strictly liable for unauthorized repetition. However, the actions taken by supervisors in disseminating MIB 27–81 were not fully developed at trial. It is the actions of the intermediate recipients of MIB 27–81, the supervisors, which will determine whether words were spoken "in such a tone or manner and under such circumstances" that the publication was reasonable. *Smith v. Jones, supra,* 335 So.2d at 897. A previous Mississippi decision, *Missouri Pacific Transportation Co. v. Beach,* 179 Miss. 764, 176 So. 156 (1937) reversed and remanded a libel case for a new trial because the evidence in the record supported only "surmises or conjectures" and was insufficient to overcome the privilege as a matter of law on appeal. *Id.* 176 So. at 159. *Accord, Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 349–50, 94 S.Ct. 2997, 3011–12, 41 L.Ed.2d 789 (1974) (liability and damage cannot be established by mere surmise, conjecture or speculation).

We are faced with a similar situation here. Since the jury received improper instructions on the crucial issue of qualified privilege, we are unable to discern on review whether the jury found an abuse of the privilege by excess publication. This Court is not in a position to reverse and render final judgment for Du Pont, nor can we allow the jury verdict to stand due to the district court's failure to instruct the jury on the proper standards to apply. There is some evidence in the record which could support a verdict for Garziano, but we can only surmise or speculate on what the jury actually held. The question of whether the qualified privilege was abused by excessive publication must be determined on remand.

## IV

When faced with a communication which may be protected by a qualified privilege, a trial court must make the preliminary determination whether the communication is protected by a qualified privilege. If the facts relevant to the existence of a qualified privilege are undisputed, then the trial court must so hold and instruct the jury accordingly; if not, the jury should be given a special interrogatory on this issue. The existence of the privilege is crucial because it affects the burden of proof and materially controls the development of the case.

On remand, the district court should instruct the jury that Du Pont's bulletin, MIB 27–81, was issued on an occasion of qualified privilege. Ordinarily the court would then instruct the jury that the defendant is entitled to a presumption of good faith, that liability cannot be established without bad faith, malice, or proof of abuse of the qualified privilege. However, the jury in the present case has already determined that Du Pont exhibited no malice or bad faith in publishing the bulletin, a conclusion we find compelled by the evidence introduced at trial. The jury also determined that Garziano is not entitled to punitive damages. These conclusions are the law of the case.

The jury shall consider only the question whether the qualified privilege was abused by excessive publication. In so instructing the jury, the district court shall make clear that Du Pont's use of its most restrictive means of communication to inform the supervisors is reasonable as a matter of law. Liability cannot properly be based on the fact that Du Pont issued MIB 27–81 to all its supervisors. The jury should decide whether the supervisors' dissemination of MIB 27–81 was within the scope of their authority and reasonable under the circumstances. We note these important factors presently unclear in the record: whether Brown & Root employees *in fact* heard any supervisor discuss the bulletin; whether any supervisor went further than the information contained in MIB 27–81 and defamed Garziano; whether any supervisor distributed a copy of the bulletin to any employees contrary to Du Pont policy; whether talk in Gulfport concerned the bulletin in particular or were general rumors about Garziano's discharge; and exactly how Garziano obtained a copy of the bulletin. We mention these factors only as indicative of facts relevant to the reasonableness of the publication but do not intimate

that this compilation is exhaustive. It is the jury's province to determine whether publication to the employees was reasonable under the circumstances.

The circle of persons with a direct and legitimate interest in Du Pont's statement on sexual harassment must also be defined. The supervisors had authority only to inform Du Pont employees about the contents of MIB 27–81. Any single supervisor could have published the information to three different groups of people: Du Pont employees, Brown & Root employees, or third parties off of the plant site. If the evidence shows that the supervisors published the information solely to Du Pont employees, then the privilege was not abused. If supervisors discussed Du Pont's statements off of company property with persons who did not have a direct or legitimate interest in the matter, the qualified privilege was overcome by excessive publication. And if the evidence shows that Brown & Root employees did overhear a Du Pont supervisor discuss MIB 27–81, liability hinges upon the intent of and actions taken by any such supervisor. A supervisor who intentionally informed Brown & Root employees of the contents of MIB 27–81 abused the privilege.[19] Any "secondary republication" by Brown & Root employees, among themselves or in the community, would be "the natural consequence of the [declarant's] original action." *Newson v. Henry,* 443 So.2d 817, 821 (Miss.1983) (citing 53 C.J.S. Libel and Slander § 85 (1948)). However, if the supervisors tried to keep the circle of confidentiality limited to Du Pont employees, then although some Brown & Root employees did overhear the contents of the bulletin read or summarized, "the fact that the alleged slanderous words may have been uttered in the presence and hearing of other persons who were accidentally present and to whom the remarks are not addressed, would not overthrow the qualified-

ly privileged nature of the communication." *Scott-Burr Stores, Corp. v. Edgar, supra,* 177 So. at 770. It is not enough for Garziano to prove that Du Pont employees discussed the contents of the bulletin (as relayed to them) with third parties. It is the supervisors, not the employees, who are agents of Du Pont's management. The question of abuse by excessive publication must focus on the actions taken by Du Pont supervisors in disseminating the bulletin and whether such actions were within the authority delegated by Du Pont.

Finally, since punitive damages will not be available, the jury may award only actual and compensatory damages. A damage award is not justified simply because the contents of the bulletin angered or distressed Garziano. The law of Mississippi requires "not the knowledge of the plaintiff nor the injury to his feelings but the degrading of reputation" for recovery. *Foreman v. Mississippi Publishers Corp.,* 195 Miss. 90, 14 So.2d 344, 347 (1943).

## V

Though we have carefully reviewed the record several times, there is not enough proof to overcome the presumption of good faith to remand the issue of malice as a jury question. Under *Boeing Co. v. Shipman,* 411 F.2d 365 (5th Cir.1969) (en banc) a verdict must be overturned if it is against the great weight of the evidence *even if* there is some evidence to support it—we must view *all* the evidence in the case. This is particularly true where there is a good faith presumption as a matter of law. However, we leave open the question whether the actions of the supervisors were such that they acted beyond their authority and abused the qualified privilege in passing along the information in MIB 27–81. Garziano is free to return to trial and establish more fully the reasonableness and possible abuse of the bulletin's

---

**19.** It is not at all clear that employees of an independent contractor present daily on Du Pont's premises do not equally share an interest in not being accused of, involved in, or a victim of on-the-job sexual harassment. However, Brown & Root employees may not be disci-

plined or discharged by Du Pont. Therefore, we assume without deciding that Brown & Root employees are not within the "circle" of employees with a direct interest in the reasons underlying Garziano's discharge.

publication by the supervisors. Therefore, this case is REVERSED and REMANDED for further proceedings in accordance with this opinion.

REVERSED and REMANDED

APPENDIX

DU PONT

**Management Information
Bulletin No. 27–81**

**DeLisle Plant**

July 24, 1981

SEXUAL HARASSMENT

The recent sexual harassment incident which resulted in an employee's termination has raised supervisory and employee questions about this subject. This particular incident was determined to be a serious act of employee misconduct, but in deference to the employees involved cannot be discussed in detail. However, deliberate, repeated, and unsolicited physical contact as well as significant verbal abuse was involved in this case.

Sexual harassment is defined as unwelcome sexual advances, either verbal or physical, where:

1. Such conduct interferes with an individual's work performance or creates an intimidating, hostile or offensive working environment; or
2. Submission to the advances is a term or condition of employment; or
3. Submission to or rejection of the advances is used as the basis for making employment decisions.

Some examples of sexual harassment are:

1. Deliberate, repeated, unsolicited verbal comments, gestures or physical actions of a sexual nature (e.g., touching, pinching or patting).
2. Explicit or implicit promise of career advancement, training, awards, lax time-keeping, or lower standards of performance in return for sexual favors.
3. Explicit or implicit threats that if the sexual demands are rejected, the victim will receive a poor performance appraisal, or be reassigned to a less desirable position/location.

The seriousness of sexual harassment depends upon several factors, some of which are:

- The degree of unsolicited physical contact; or
- Repeated actions after complaints or warnings; or
- Physically threatening statements or actions:

Isolated verbal comments of a sexual nature, swearing and use of slang sexual descriptions, while repulsive to most decent persons, are not necessarily sexual harassment. However, continued unwelcomed sexual comments or innuendos—made by one employee to another—can be considered to be actions requiring some form of disciplinary action.

Supervisors at DeLisle should understand that: (a) sexual harassment is unacceptable conduct, (b) timely corrective action should be taken by supervision when problems of this type exist; and (c) corrective action can involve progressive discipline (verbal contact, special review, probation and/or termination) depending upon the seriousness of the action.

As with all job-related problems, employees should be encouraged to discuss harassment concerns with their supervisor. Supervision then has the obligation to:

1. Investigate the situation thoroughly, including discussions with both parties.
2. Make a judgment about the seriousness of the allegation.
3. Seek counsel when needed.
4. Recommend appropriate action to correct the problem.

Only by each of us meeting our responsibilities in this area can we provide each of us the right to work in an atmosphere free of harassment and abuse.

I suggest you cover the key points of this letter with each of your employees.

/s/ D.L. Settle
D.L. SETTLE
PLANT MANAGER

DLS:ln

GARWOOD, Circuit Judge, concurring:

With respect to malice, although I am inclined to believe that the evidence as recited in Judge Garza's opinion is sufficient to present a question for the jury, I agree that the remand need not embrace that issue since, as Judge Garza points out, the jury found against the plaintiff on that matter. In all other respects, I join in Judge Garza's persuasive opinion.